IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH HUGH MAZUREK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-5103 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                      August 30, 2023

Joseph Hugh Mazurek ("Plaintiff") brought this action pursuant to 42 U.S.C.

§ 405(g) to review the Commissioner's final decision denying his applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the

reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") is supported by substantial evidence.

# I.  **PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI in May 2018, alleging disability beginning on

April 4, 2012, as a result of alcoholism, seizures, anxiety, depression, bipolar disorder,

and back problems related to a previous T12 fracture.  Tr. at 519, 754, 761, 800.[1]  His

applications were denied at the initial level of review.  Id. at 580-89.  At his request, id. at

590, an administrative hearing was held before an ALJ on January 26, 2021.  Id. at 506-

47.  At the hearing, Plaintiff amended his alleged onset date to November 1, 2018, and

---

[1]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before his date last insured ("DLI").  20 C.F.R. § 404.131(b).  The most recent Certified
Earnings Record indicates and the ALJ found that Plaintiff was insured through
December 31, 2018.  Tr. at 479, 796.

signed an amended onset date form.  Id. at 519, 521-22, 798.  On March 26, 2020, the

ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.  Id. at 477-91.

The Appeals Council denied Plaintiff's request for review on September 24, 2021, id. at

1-4, making the ALJ's March 26, 2020 decision the final decision of the Commissioner.

20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on November 19, 2021.  Doc. 1.

The matter is now fully briefed and ripe for review.  Docs. 11-13.[2]

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r</u>

<u>of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla." <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v.</u>

<u>Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal

issues.  <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  <u>See</u> Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 7.

impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantially gainful activity ("SGA");
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments" ["Listings"], 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

III.   **DISCUSSION**

Plaintiff was born on June 9, 1984, and thus was thirty-four years of age at the time of his amended alleged disability onset date (November 1, 2018) and thirty-five at the time of the ALJ's decision (March 26, 2020).  Tr. at 540.  He is six feet, two inches tall, and weighs approximately 165 pounds.  Id. at 800.  Plaintiff lives in an apartment with his uncle.  Id. at 528.[3]  He completed the 12th grade and attended special education classes, and subsequently obtained an associate's degree in computer networking.  Id. at 540, 801.  He has past relevant work as a user support analyst.  Id. at 542.

A.   **ALJ's Findings and Plaintiff's Claims**

In the March 26, 2020 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since April 4, 2012, the original alleged disability onset date.  Tr. at 479.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), intractable epilepsy without status epilepticus (or unknown etiology with aura and ptosis of right eyelid), obstructive sleep apnea, history of alcohol abuse, and chronic compression fracture of T12.  Id. at 479-80.[4]  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 480.  Furthermore, in

_____

[3]In his Function Report, Plaintiff indicated that he lives with his uncle in a mobile home.  Tr. at 1005.

[4]Where appropriate, Plaintiff's impairments will be defined in the medical evidence summary.

reviewing the "paragraph B" criteria of the relevant mental health Listings, the ALJ found that Plaintiff had moderate limitation in the area of concentrating, persisting or maintaining pace, mild limitation in the areas of interacting with others and adapting or managing oneself; and no appreciable limitation in the area of understanding, remembering, or applying information.  Id. at 481-82.

In his RFC assessment, the ALJ determined that Plaintiff retains the RFC to perform light work, except that he can occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally stoop, crouch, kneel and crawl; frequently use his right dominant upper extremity; and frequently operate foot controls bilaterally.  Tr. at 482.  Plaintiff can have no exposure to driving vehicles, unprotected heights, moving machinery, and flashing or bright lights; frequent exposure to extreme heat or cold, wetness or humidity, irritants such as fumes, odors, dust and gasses, poorly ventilated areas, and chemicals; and no exposure to flashing lights or bright lights.  Id. at 482-83. He is further limited to work in no more than a moderate noise setting, to a low-stress job with only occasional decision making and only occasional changes in the work setting, and to simple, routine tasks at a consistent pace, but not a production rate pace.  Id. at 483.  Based on the testimony of a vocational expert ("VE"), the ALJ found that although Plaintiff could not perform his past work, he could perform other work.  Id. at 489-90. As a result, the ALJ concluded that Plaintiff was not disabled.  Id. at 491.

Plaintiff argues that the ALJ (1) failed to adequately consider the frequency and severity of Plaintiff's epileptic seizures, (2) improperly rejected the manipulative limitations found by Dr. Choudry, and (3) failed to include all credibly established

limitations in hypothetical questions posed to the VE.  Docs. 11 & 13.  Defendant

responds that the ALJ's decision is supported by substantial evidence.  Doc. 12.

### B.       Medical Evidence Summary[5]

On March 29, 2018, Howard M. Natter, M.D., performed a neurological

evaluation of Plaintiff's underlying seizure disorder.  Tr. at 1215-19.  Dr. Natter noted

Plaintiff's history of alcohol abuse and indicated that the consultation arose due to two

seizures Plaintiff experienced while residing at the Valley Forge Medical Center for

alcohol detoxification.  Id. at 1215.  Plaintiff reported that his seizures began several

years ago and occur whether he is drinking or not, that the longest he could go without a

seizure was two or three months, and that he had at least three seizures in the six months

prior to his hospitalization for alcohol detoxification.  Id.  Plaintiff reported binge

drinking "a 5th of alcohol" two or three times per week.  Id.  He described his seizures as

"preceded by an aura consisting of a 1-2 minute sense of head pressure," followed by

blacking out and memory loss of what occurred during the seizure, and postictal

symptoms of diffuse soreness and weakness.  Id.[6]  He reported no family history of

seizures, no history of childhood seizures, and no concussions as an adult.  Id.[7]  Plaintiff

---

[5]Plaintiff's claims concern the ALJ's consideration of his epilepsy and manipulative limitations, and therefore the medical evidence summary will focus primarily on those aspects of the record.

[6]Postictal is defined as the abnormal condition occurring between the end of an epileptic seizure and return to baseline.  See https://pubmed.ncbi.nlm.nih.gov (last visited August 11, 2023).

[7]Dr. Natter reviewed limited records from St. Mary's Medical Center ("St. Mary's") showing that Plaintiff first presented to the hospital for seizure evaluation in 2010.  Tr. at 1215.  The doctor noted that Plaintiff underwent an MRI of the brain in

reported that Keppra[8] has been his only seizure medication, with no dosage adjustments.
Id.  He also reported using a cane for several months for intermittent pain in his left lower
extremity, without accompanying back pain.  Id.

Dr. Natter noted Plaintiff's prior diagnoses as alcoholism, anxiety, depression,
epilepsy, hypertension, seizures, and sleep apnea.  Tr. at 1217.  Upon examination,
Plaintiff appeared alert and fully oriented, and exhibited intact speech and language,
short/long term memory, and attention span.  Id. at 1218.  He had normal tone and bulk,
5/5 strength in all four limbs, and his deep tendon reflexes were 2/4 in his arms and 3+/4
in his legs.  Id.  Plaintiff had no tremor activity and exhibited intact finger-to-nose, arm
rotation, and fine hand dexterity.  Id.  Plaintiff exhibited intact gait and stance, and Dr.
Natter noted that Plaintiff used a cane without any obvious balancing problems.  Id.  The
doctor's impression was intractable epilepsy of unspecified type.  Id.  As to etiology, the
doctor noted that "[f]rom his history, it is very difficult to tell if his seizures are related to
alcohol intoxication/withdrawal," but that because Plaintiff reported having seizures

---

August 2010, which showed a "mild chiari 1 malformation otherwise unremarkable," and
EEGs of Plaintiff's brain performed in October 2010 and November 2012, which were
unremarkable.  Id. at 1216.  A chiari malformation type 1 occurs when the section of the
skull containing the cerebellum is too small or is deformed, causing the lower part of the
cerebellum to be displaced into the upper spinal canal.  See
https://mayoclinic.org/diseases-conditions/chiari-malformation (last visited August 11,
2023).  Dr. Natter also noted that Plaintiff's epilepsy was without status epilepticus, tr. at
1219, which is defined as a seizure that lasts more than five minutes "or when seizures
occur very close together and the person doesn't recover consciousness between them."
See https://epilepsy.com/complications-risks/emergencies/status-epilepticus (last visited
Aug. 28, 2023).

[8]Keppra (generic levetiracetam) is used to treat certain types of seizures in people
with epilepsy.  See https://www.drugs.com/keppra (last visited August 11, 2023).

despite going six months without alcohol, "it is more likely that we are dealing with underlying epilepsy rather than alcohol related abnormalities." Id. at 1219. Dr. Natter also noted that Plaintiff's most recent seizure episodes while in rehabilitation were "most likely due to alcohol withdrawal," and he counseled Plaintiff on the need to refrain from alcohol use post-rehabilitation. Id. The doctor ordered an EEG and increased Plaintiff's dosage of Keppra. Id. An EEG performed on May 2, 2018, yielded normal findings. Id. at 1236.

On November 28, 2018, Abaid Chaudry, M.D., performed a consultative internal medicine examination. Tr. at 1366-69. Plaintiff reported chronic epilepsy since 2008, erratic and generally grand mal seizures, with eight -to- nine seizures in the prior two months, each lasting four -to- five minutes with an aura in his right eye. Id. at 1366. He also reported "lifelong anxiety and depression," attention deficit hyperactivity disorder ("ADHD") since he was five or six years old, and low back pain which began after he sustained a thoracic compression fracture in 2011. Id. He also reported that he drank alcohol weekly. Id. at 1367. Dr. Chaudry identified Plaintiff's current medications as Keppra, buspirone, clonazepam, mirtazapine, tizanidine, sertraline, trazodone, and Vistaril. Id. at 1366-67.[9] Regarding activities of daily living, Plaintiff stated that he

---

[9]Buspirone (marketed as BuSpar) is an anti-anxiety. See https://drugs.com/buspirone.html (last visited August 14, 2023). Clonazepam (marked as Klonopin) is used to treat certain seizure disorders. See https://drugs.com/clonazepam.html (last visited August 14, 2023). Mirtazapine is used to treat MDD in adults. See https://drugs.com/mirtazapine.html (last visited August 14, 2023). Tizanidine is a short-acting muscle relaxer. See https://drugs.com/tizanidine.html (last visited August 14, 2023). Sertraline and Trazodone are antidepressants. See https://drugs.com/sertraline.html (last visited August 14, 2023).

cleans one -to- two times per week, does laundry once per week, and cares for his personal needs daily.  Id. at 1367.

Upon examination, Dr. Chaudry observed that Plaintiff ambulated with a slightly unsteady gait, with significant imbalance when attempting to walk on his heel and toes, performed a full squat, had normal stance, used no assistive devices, and needed no help changing, getting on or off the examination table, or rising from a chair.  Tr. at 1367. Plaintiff's spine appeared unremarkable, straight-leg raise ("SLR") tests were negative bilaterally, he exhibited 4+/5 strength in both arms, and his joints were stable with no redness, heat, or effusion.  Id. at 1368.  He exhibited 4/5 grip strength bilaterally but had impaired hand and finger dexterity, with difficulty zipping, buttoning, and tying.  Id. at 1369.  The doctor diagnosed Plaintiff with chronic epilepsy, anxiety/depression, and chronic low back pain, and opined that his prognosis was guarded.  Id.

Also on November 28, 2018, Dr. Chaudry completed a mental source statement of ability to do work-related activities (physical).  Tr. at 1370-75.  The doctor opined that Plaintiff could lift and/or carry up to twenty pounds frequently and up to 100 pounds occasionally; and that in an eight-hour workday he could sit continuously for four hours and for five hours total, stand continuously for three hours and for four hours total, and walk continuously for one hour and for two hours total.  Id. at 1370-71.  He did not require the use of a cane to ambulate.  Id. at 1371.  Plaintiff could frequently reach,

--------

https://drugs.com/trazodone.html (last visited August 14, 2023).  Vistaril (generic hydroxyzine) is a sedative used to treat anxiety and tension.  See https://drugs.com/vistaril.html (last visited August 14, 2023).

finger, feel, and push/pull with his bilateral hands, and occasionally handle objects with his hands, and he could frequently operate foot controls bilaterally.  Id. at 1372.  Dr. Chaudry opined that Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and never climb ladders or scaffolds; that he could not tolerate exposure to unprotected heights or operate a motor vehicle, could occasionally be exposed to moving mechanical parts, and could frequently tolerate other environmental conditions; and that he could tolerate moderate noise such as in an office.  Id. at 1373-74. Finally, the doctor opined that Plaintiff could not perform activities like shopping and sorting, handling, or using paper/files, but was not otherwise limited based on his physical impairments.  Id. at 1375.

On December 4, 2018, Plaintiff underwent a 48-hour ambulatory EEG which yielded normal results.  See tr. at 2540.

On December 12, 2018, John Bart, D.O, completed a physical RFC assessment as part of Plaintiff's initial disability determination.  Tr. at 571-74.  Dr. Bart opined that Plaintiff was capable of light-exertional work limited to never climbing ladders, ropes, and scaffolds and not involving exposure to unprotected heights/hazards or moving machinery.  Id. at 572-73.

Plaintiff sought emergency room treatment at St. Mary's on February 4, 2019, for reported seizure activity the morning after he consumed "a fifth of vodka."  Tr. at 1414, 1416.  Plaintiff reported that he usually drinks one pint of alcohol per day and that he had multiple admissions for alcohol abuse as well as suspected seizure activity with similar circumstances.  Id. at 1416.  A CT scan of Plaintiff's brain yielded normal results.  Id. at

1416, 1422.  The attending physician continued Plaintiff on Keppra, started lisinopril[10] for hypertension and non-narcotic analgesics for back pain.  Id. at 1416.

On February 8, 2019, during his hospitalization, Plaintiff underwent a neurology consultation by Yelena Shipgel, M.D.  Tr. at 1419-22.  Dr. Shipgel noted Plaintiff's history of seizures and alcohol abuse, noting that he had tried rehabilitation several times without success, and wanted to try again.  Id. at 1419.  He reportedly had more seizures since his hospitalization, witnessed by a nurse and his girlfriend.  Id.  His general and neurological examinations yielded normal results.  Id. at 1421.  Dr. Shipgel continued Plaintiff on Keppra and detoxification protocol.  Id. at 1422.  On February 11, 2019, Plaintiff was discharged to the Valley Forge substance abuse rehabilitation facility, with referrals for further evaluation with psychiatry and neurology.  Id. at 1414, 1416.

On May 28, 2019, brain MRIs showed no focal area of signal change in the brain, no mass effect or midline shift, no hydrocephalus, and cerebrellar tonsillar ectopia.  Tr. at 1410.[11]  On September 10, 2019, a routine EEG yielded normal findings.  See id. at 2540.

Plaintiff was incarcerated from October 16 to December 15, 2019, during which he experienced an increase in seizure activity and was started on Depakote.  Tr. at 2409-

---

[10]Lisinopril is an ACE inhibitor used to treat high blood pressure.  See http://www.drugs.com/lisinopril.html (last visited August 14, 2023).

[11]Tonsil of cerebellum is defined as the rounded mass forming part of the hemisphere of the cerebellum, see Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1937, and ectopia refers to an abnormal position.  Id. at 591.  The MRI report indicates that Plaintiff's ectopia extended approximately four millimeters below the level of the foramen magnum.  Tr. at 1410, 2540.

12; see also id. at 2536.[12]  Plaintiff was continued on both Keppra and Depakote, until the latter was discontinued due to weight gain.  See id. at 2536.  On November 3, 2019, while incarcerated, Plaintiff was seen at the Doylestown Hospital Emergency Department after having a seizure.  Id. at 2417; see also id. at 2536.  The attending treatment provider did not witness any seizure activity and found that Plaintiff had a baseline mental status, and recommended an increase in Plaintiff's Depakote.  Id. at 2420.

On January 15, 2020, Plaintiff had a neurology follow-up with LyMay Kouai, P.A. Tr. at 2536-42.  Plaintiff reported having seizures during his recent period of incarceration, denied any seizure activity since being released from jail, denied any alcohol intake in four -to- five months, and stated that two weeks prior he had experienced an aura consisting of right vision loss followed by neck stiffness and posterior head tingling.  Id. at 2536.  An examination revealed mostly unremarkable findings except for 4+/5 grip strength on the right upper extremity.  Id. at 2540.  Ms. Kouai noted Plaintiff's history of mostly normal diagnostic imaging, except for cerebellar tonsillar ectopia and mild chiari 1 malformation.  Id. at 2439-40.  In her assessment, Ms. Kouai stated:

> [Plaintiff] has a history of alcohol abuse and depression, and difficulties with recurrent seizures since 2010.  He has a well-defined aura followed by . . . generalized convulsions, followed by postical lethargy, headaches and confusion. Originally, his seizures were attributed to alcohol withdrawal or intoxication, but he has had seizures while sober for up to 6 months while in prison without alcohol use for 6 weeks. Despite his normal EEGs, it appears that he is suffering from

---

[12]Depakote (generic divalproex sodium) is used to treat various types of seizures. See https://www.drugs.com/depakote.html (last visited August 14, 2023).

> underlying epilepsy, of uncertain etiology.  It remains
> difficult to tell how many of his seizures are related to alcohol
> withdrawal, alcohol intoxication, or his epilepsy.

Id. at 2541.  Ms. Kouai's diagnoses included ptosis of the right eyelid.  Id.[13]  Plaintiff

underwent a brain MRI five days later, on January 20, 2020, which showed no evidence

of acute infracranial abnormality.  Id. at 2533.

On February 13, 2020, Fredric Goldberg, M.D., performed a consultation

regarding Plaintiff's candidacy for medical marijuana.  Tr. at 2525-27.  At that time,

Plaintiff was taking Keppra, gabapentin, Cymbalta, and Klonopin.  Id. at 2525.[14]  Upon

examination, Plaintiff exhibited a stooping gait, normal strength and muscle tone,

neurological findings within normal limits, and normal psychiatric findings.  Id. at 2526-

27.  Spinal examination revealed tenderness to palpation around T12 with bilateral

muscle spasms to palpations and restricted and painful extension, flexion, and lateral

flexion.  Id. at 2527.  Dr. Goldberg concluded that control of Plaintiff's back pain had

been inadequate and that he was a good candidate for medical marijuana.  Id. at 2527.

On March 2, 2020, a physical examination was performed by Stephen Masceri,

M.D., of Physical Medicine and Rehabilitation.  Tr. at 2557-58.  Plaintiff reported social

alcohol use.  Id. at 2557.[15]  He reported persistent pain in the dorsal and lumbar spine

---

[13]Ptosis is drooping of the upper eyelid.  DIMD at 1551.

[14]Gabapentin is an anticonvulsant used to treat partial seizures.  See
https://drugs.com/gabapentin.html (last visited August 14, 2023).  Cymbalta (generic
duloxetine) is used to treat MDD and GAD.  See  https://www.drugs.com/cymbalta.html
(last visited August 14, 2023).

[15]Dr. Masceri uses the present tense when referring to Plaintiff's social alcohol
use, which suggests that Plaintiff may have resumed drinking alcohol after his February

with occasional pain and numbness into the right leg as well as right leg weakness at times.  Id.  Upon examination, Plaintiff exhibited tenderness throughout the thoracic and lumbar spine, with intact pinprick sensation in the bilateral lower extremities, equal and intact reflexes, normal bulk and tone, and intact (5/5) strength in the lower extremities. Id.  An EMG and nerve conduction study was performed on Plaintiff's thoracic spine, lumbar spine, and lower extremities.  Id. at 2558.  The nerve conduction study was within normal limits, while the EMG portion of the study revealed mild active denervation involving the L5 innervated muscles of the right lower extremity and right paraspinal muscles.  Id.  Dr. Masceri advised Plaintiff to consider a trial of physical therapy.  Id.

## C.    **Other Evidence**

At the March 5, 2020 administrative hearing, Plaintiff testified that he is prevented from working due to epilepsy and a T12 compression fracture of his spine.  Tr. at 522. The epilepsy causes auras where he loses vision in his right eye and cannot walk in a straight line, and certain lights (such as fluorescent lights) can trigger his seizures.  Id. His balance issues occur a few times per week, and he has fallen down.  Id. at 536-37. He testified that he last had seizures on March 2 and 3, 2020 -- a few days before the hearing -- and that they did not require and treatment.  Id. at 522-23.  He reported having issues with his memory and concentration, id. at 526, 537-38, and daily headaches.  Id. at 532.

---

4-11, 2019 detoxification treatment at Valley Forge and/or after his January 15, 2020, follow-up with Ms. Kouai.

14

Plaintiff testified that as a result of the spinal injury, "I can't sit too long and I can't stand too long," tr. at 522, and that he has pain from his lower back to where the spine goes into the back of his head. Id. at 523. He stopped seeking treatment for his back pain in 2014 because "[i]t wasn't working for me." Id. at 529. Plaintiff also testified that he has shaking ("day tremors") in his right hand, which occurs every day and all day, and later stated that he has tremors in his left hand also. Id. at 525, 532. He stated that he has no trouble grasping larger or smaller objects but then stated that he has problems using buttons and zippers, and also stated that both hands will turn "purplish-blue" about twice per day, at which time he cannot feel whether he is holding anything. Id. at 526, 532. Plaintiff obtained a medical marijuana card and stated that medical marijuana is not helping much. Id. at 534.

Plaintiff estimated that he could stand about ten minutes without needing to take a break; sit for about twenty-five minutes, although he must slouch because he cannot keep his back against the back of the chair; and walk approximately one mile and which point he would be "in extreme pain." Tr. at 524. He testified that he can lift about twenty-five to thirty pounds, id. at 525, and later clarified that he can lift five -to- ten pounds continuously. Id. at 532. He can take public transportation, but reports having panic attacks. Id. at 528. He testified that he does laundry and can vacuum and clean as long as there are no heavy objects and until his back hurts. Id. at 529. He lives in an apartment with his uncle, receives financial assistance from his parents and brother, and he gets rides from his uncle, mother, and girlfriend. Id. at 528, 531. He does not drive and has never had a driver's license. Id. at 527.

Plaintiff confirmed that he has a history of alcohol abuse, tr. at 523, and testified that he last drank alcohol before his December 2019 incarceration. Id. at 523-24. He attends AA meetings and psychological services three times per week -- one individual session for drugs and alcohol, and two group sessions for post-traumatic stress disorder ("PTSD") -- and sees a psychiatrist twice per month for medication management. Id. at 530.[16] He has trouble sleeping longer than five hours per night because his "mind is always racing" and he "can never get comfortable." Id. at 536. In a typical day, Plaintiff gets up, eats, watches television, and goes to his meetings. Id. at 531.[17]

The VE classified Plaintiff's past relevant work as a user support analyst as skilled and sedentary. Tr. at 542. The ALJ and counsel asked the VE a series of hypothetical questions. Id. at 542-46. Most pertinent to this action, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who could perform light work, with limitations that he could occasionally climb ramps or stairs;

---

[16]When questioned by counsel, Plaintiff testified that he began experiencing PTSD symptoms about two months before the hearing, and that the PTSD-related panic attacks cause him to "just freak out" and "kind of break down," with sadness, shakiness, and difficulty standing up straight. Tr. at 534-36.

[17]Plaintiff's testimony is generally consistent with the symptoms and limitations described in his Function Reports. Tr. at 826-37, 1005-10. Plaintiff also submitted a seizure calendar for the period July 3, 2019, through March 3, 2020, which although not entirely clear appears to indicate approximately five incidents per month, with most days highlighted in the months of November and December 2019. Id. at 2561.
Moreover, during an independent consultative psychological evaluation performed by Frank Sergi, Ph.D., on November 28, 2018, Plaintiff reported that his family relationships were good and that he had a girlfriend, his hobbies and interests included going to the movies, playing soccer and baseball and watching sports, and that he spent time watching television, listening to music, reading, using social media, playing sports, and going out to eat. Tr. at 1361-62.

never climb ladders, ropes or scaffolds; occasionally stoop, crouch, kneel and crawl; frequently use his right dominant upper extremity; frequently operate foot controls bilaterally; have no exposure to driving vehicles, unprotected heights, moving machinery, and flashing or bright lights; frequent exposure to extreme heat or cold, wetness or humidity, irritants such as fumes, odors, dust and gasses, poorly ventilated areas, and exposure to chemicals; no exposure to flashing lights or bright lights; a moderate noise setting; a low-stress job with only occasional decision making and only occasional changes in the work setting; and simple, routine tasks at a consistent pace, but not a production rate pace.  Id. at 542-43.  The VE responded that such an individual could perform work including survey worker, office helper, and sorter.  Id. at 543.  With the added limitations of only frequent use of the bilateral upper extremities and sedentary exertion, the VE identified jobs that the hypothetical individual could still perform.  Id. at 543-44.  However, if the individual would be off task 20% of the time in addition to regularly scheduled breaks, there would be no work the individual could perform.  Id. at 544.  Similarly, when counsel asked the VE to consider the same individual as in the ALJ's first hypothetical, but who would be limited to only occasional handling with the bilateral upper extremities, the VE testified that the individual would not be able to work. Id. at 545-46.

> ### D.    Consideration of Plaintiff's Claims

Plaintiff argues that the ALJ (1) failed to adequately consider the frequency and severity of Plaintiff's epileptic seizures, (2) improperly rejected the manipulative limitations found by Dr. Choudry, and (3) failed to include all credibly established

limitations in hypothetical questions posed to the VE.   Docs. 11 & 13.   Defendant

responds that the ALJ's decision is supported by substantial evidence.   Doc. 12.

1.   ALJ's Consideration of Plaintiff's Epilepsy

Plaintiff first argues that the ALJ failed to adequately consider the frequency and

severity of Plaintiff's epileptic seizures.   Doc. 11 at 4-10; Doc. 13 at 1-5.   Defendant

counters that this aspect of the ALJ's opinion is supported by substantial evidence.   Doc.

12 at 4-8.[18]

As previously noted, the ALJ found that Plaintiff's severe impairments included

intractable epilepsy without status epilepticus, of unknown etiology with aura and ptosis

of the right eyelid.   Tr. at 479.   The ALJ also found that Plaintiff did not meet Listing

11.02 for Epilepsy, id. at 480-81,[19] and that Plaintiff had no marked limitations in any

area of functioning.   Id. at 481-82.   The ALJ then discussed Plaintiff's epilepsy in greater

detail in his summary of Plaintiff's testimony and medical record to formulate the RFC:

> [Plaintiff] testified that he stopped working because of his
> epilepsy with associated auras wherein he loses vision in his
> right eye, cannot walk in a straight line, and is bothered by
> certain lights, which can trigger his seizures.   When queried,
> he indicated that his most recent seizures occurred a few days
> earlier . . .; however, no treatment was required.

_____

[18]Defendant construes Plaintiff's claim as one aspect of his challenge to the ALJ's
RFC assessment.   See Doc. 12 at 4.   However, I construe the claim as alleging errors of
law in the ALJ's consideration of the evidence regarding Plaintiff's epilepsy, and I will
therefore address this claim separately from Plaintiff's RFC claim addressed in the next
section.

[19]The Listing requires consideration of the type of seizures involved, how
frequently they occur despite treatment, and the seizures' limiting effects.   20 C.F.R. pt.
404, subpt. P, app. 1, Listing 11.02(A)-(D).

. . . .

As for the longitudinal record, an MRI of the brain from August 2010 showed a mild chiari 1 malformation, but was otherwise unremarkable.  ([Tr. at 1216]).  Likewise, an EEG of the brain was unremarkable.

On March 29, 2018, [Plaintiff] underwent a neurologic consultation for evaluation of an underlying seizure disorder ([Tr. at 1215-19]).  His history of alcohol abuse was noted and such record reflects [Plaintiff] had two seizures while residing in the Valley Forge Medical Center for alcohol detoxification.  [Plaintiff] was a poor historian and reported a history of at least 3 seizures in the past 6 months; however, it was not clear whether these occurred in the context of alcohol abuse.  [Plaintiff] reported his seizures were "preceded by an aura consisting of a 1-2 minute sense of head pressure." [Plaintiff] reported blacking out and losing his memory during the seizure as well as post-tictal symptoms of diffuse soreness/weakness.  He also reported he was binge drinking "a 5th of alcohol" 2 or 3 times per week.  Additionally, he reported he had been using a cane for several months for intermittent pain in his left lower extremity but denied any back pain. . . .  Gait and stance were intact, but [Plaintiff] used a cane despite not having any obvious balance problems. Sensory, motor, strength, and cerebellar functions were all intact.  The diagnostic impression was unspecified epilepsy most likely complex partial seizures.  At such time, his dosage of Keppra was increased.  Of note, a May 2018 EEG was unremarkable ([id. at 1236]).

The November 28, 2018, report of the independent consultative examiner reflects [Plaintiff] reported 8 to 9 seizures in the prior two-months, lasting 4-5 minutes with an aura in his right eye ([Tr. at 1366]). . . .

On February 4-11, 2019, [Plaintiff] was admitted to the Valley Forge substance abuse rehabilitation facility for alcohol abuse ([tr. at 1414]). . . .  A CT scan of the brain was normal ([Id. at 2540]).

A May 2019 MRI of the brain showed no focal area of signal change in the brain, no mass effect or midline shift, and no

19

hydrocephalus ([Tr. at 1410]).  It showed only cerebellar tonsillar ectopia without clinical correlation.

The record reflects [Plaintiff] was in a correctional facility from October 16, 2019 through December 15, 2019. . . ([Tr. at 2536]).  While incarcerated, he had increased seizure activity and was started on Depakote.  For an interim, he was on both Depakote and Keppra, but later discontinued Depakote due to weight gain.  On November 3, 2019, he was seen in Doylestown Hospital ER, which occurred while he was in jail; however, no seizure activity was witnessed and [Plaintiff] was at baseline mental status ([Id. at 2420]).

At a January 15, 2020, neurology encounter, [Plaintiff] denied any seizure activity since being discharged from jail; however, he reported experiencing aura two weeks earlier consisting of right vision loss followed by neck stiffness and posterior head tingling ([Tr. at 2536]).  An accompanying physical examination was essentially unremarkable apart from findings of slightly diminished (4+/5) grip strength in the right (dominant) upper extremity.  Likewise, once again neurologic findings were non-focal.  Moreover, such record reflects a routine EEG from September 2019 was normal and that a December 2018 ambulatory 48-hour EEG was also normal.

Id. at 483-84.[20]  Finally, the ALJ quoted Plaintiff's neurological treatment provider as saying that "[d]espite [Plaintiff's] normal EEGs, it appears he is suffering from underlying epilepsy, of uncertain etiology.  It remains difficult to tell how many of his seizures are related to alcohol withdrawal, alcohol intoxication or his epilepsy."  Id. at 484 (quoting id. at 2541).

Plaintiff argues that the ALJ failed to properly consider the frequency, duration, and postictal effects of Plaintiff's epileptic seizures, noting that the only epilepsy-related

---

[20]Certain of the ALJ's record page references appear mistaken, and I have attempted to identify the correct applicable page references.

limitation in the RFC was that Plaintiff should not have any exposure to flashing or bright lights.  Doc. 11 at 6; Doc. 13 at 1-2.  However, the ALJ repeatedly referenced the frequency of seizures reported by Plaintiff himself, as memorialized in the evaluation and treatment record.  For example, the ALJ noted Plaintiff's report of at least three seizures in the six months preceding the March 29, 2018 neurologic consultation by Dr. Natter; eight or nine seizures in the two months prior to an independent consultative examination in November 2018; increased seizure activity while incarcerated for two months in late 2019; and no seizures during the month following his release from jail.  Plaintiff told Dr. Natter that the longest he could go without a seizure was two or three months.  Id. at 1215.  Additionally, the ALJ noted that Plaintiff's seizures are preceded by an aura lasting one -to- two minutes, the seizures last four -to- five minutes, and he has postictal symptoms of soreness and weakness.  Id. at 483.  The ALJ also evaluated Plaintiff's seizures under the Listing for epilepsy, which includes factors such as the duration and effects of seizures, id. at 480-81, and the ALJ explicitly stated that the RFC addressed Plaintiff's seizure disorder and associated right eye pstosis by restricting him from climbing, heights/moving machinery, driving motor vehicles, exposure to flashing or bright lights and to more than moderate noise, and to from certain environmental conditions.  Id. at 487.  Thus, it cannot fairly be said that the ALJ failed to consider the frequency, duration, and postictal effects of Plaintiff's seizures.

Plaintiff argues that the ALJ improperly referenced Plaintiff's alcohol abuse, causing the ALJ to minimize the frequency, duration, and postictal effects of Plaintiff's

seizures.[21]  In support of this argument, Plaintiff contends that the record supports the

conclusion that Plaintiff's seizures are caused by his underlying intractable epilepsy and

not his alcohol use, as for example he continued to experience seizures during periods of

forced sobriety.  Doc. 11 at 5-9; Doc. 13 at 2-4.  Plaintiff relies on the opinion of Dr.

Natter, who opined that "it is more likely that we are dealing with underlying epilepsy

rather than alcohol related abnormalities," tr. at 1219, and on the following statement

made by Ms. Kouia, Plaintiff's neurological treatment provider:

> Originally, [Plaintiff's] seizures were attributed to alcohol
> withdrawal or intoxication, but he has had seizures while
> sober for up to 6 months while in prison without alcohol use
> for 6 weeks.  Despite [Plaintiff's] normal EEGs, it appears
> that he is suffering from underlying epilepsy, of uncertain
> etiology.  It remains difficult to tell how many of his seizures
> are related to alcohol withdrawal, alcohol intoxication, or his
> epilepsy.

Id. at 2541 (quoted in Doc. 11 at 7 & Doc. 13 at 4).  Plaintiff argues that the ALJ

mischaracterized Ms. Kouia's opinion by omitting the first sentence of the above-quoted

statement, and that the ALJ did so with "[t]he apparent intention" of implying that

Plaintiff's treatment providers remained "uncertain regarding the cause of his seizures or

to suggest that they may in fact be caused by alcohol, when the full context of her

statement reveals that [they] actually concluded that [Plaintiff's] seizures were caused by

his underlying intractable epilepsy."  Doc. 13 at 4.

---

[21]The ALJ found that Plaintiff's alcohol abuse was "significant, but not material"
to his claim.  Tr. at 487.

I disagree with Plaintiff's characterization of Ms. Kouia's opinion insofar as Plaintiff reads certainty into the statement when the statement in fact expresses continuing uncertainty. That is, whether one reads Ms. Kouia's statement as shortened by the ALJ (and Defendant), or in its entirety as set forth by Plaintiff, in both instances the bottom line is that Plaintiff's epilepsy is of "uncertain etiology" and that "[i]t remains difficult to tell how many of his seizures are related to alcohol withdrawal, alcohol intoxication or his epilepsy." Tr. at 2541. As such, Ms. Kouia's acknowledgment that Plaintiff's epilepsy is of "uncertain etiology" is only slightly more equivocal than the opinion of Dr. Natter, whose opinion that "it is more likely that we are dealing with underlying epilepsy rather than alcohol related abnormalities," id. at 1219, and does not evoke certainty regarding causation. In any event, the record is replete with references to Plaintiff's heavy drinking and that many of his seizures occurred in the context of heavy alcohol consumption, and therefore it would be peculiar for the ALJ not to have referenced Plaintiff's alcohol abuse at multiple points in her narrative summary and discussion. Moreover, the potential causes of Plaintiff's epilepsy as identified by Ms. Kouia include alcoholism, which can cause an array of long-term physical damage, and alcohol withdrawal, both of which would remain viable possible causes of seizures experienced even during periods of Plaintiff's enforced sobriety, such as his two-month incarceration. At bottom, the cause of Plaintiff's epilepsy, and whether it is related to his alcohol use, are beside the point. The real issue is whether the ALJ credited that Plaintiff suffers from epilepsy and seizures, which the ALJ clearly did.

23

Plaintiff argues that the ALJ erred by including Plaintiff's "history of alcohol abuse" as a severe impairment.  Doc. 11 at 7-8.  Dr. Natter listed alcoholism as one of Plaintiff's diagnoses by history, tr. at 1216, Plaintiff was hospitalized for alcohol detoxication, id. at 1215, and alcohol-related diagnoses appear throughout the medical record.  Therefore, even though the ALJ found that alcohol abuse was not material to the disability determination, id. at 487, the ALJ's decision to include Plaintiff's history of alcohol abuse as a severe impairment is supported by the record.

Plaintiff also argues that the ALJ further minimized Plaintiff's epilepsy by improperly relying on normal diagnostic testing, asserting that normal EEG findings are not inconsistent with a diagnosis of epilepsy.  Doc. 11 at 9; Doc. 13 at 4-5.  This argument is similarly beside the point as Plaintiff's diagnosis of epilepsy is not disputed, and the ALJ found Plaintiff's intractable epilepsy to be a severe impairment.  Moreover, the ALJ did not rely on the normal diagnostic test results as the only basis for her adverse decision, but rather referenced the normal/unremarkable test results as part of her thorough narrative summary of the record, which included Plaintiff's own statement regarding his functioning and the totality of the mental and physical status examinations and clinical findings.  See tr. at 484-89.

The difficulty with Plaintiff's argument is that he does not identify any particular limitations the ALJ should have found in relation to his epilepsy.  That is, Plaintiff repeatedly argues that the ALJ failed to consider the frequency, duration, and severity of his seizures and their post-ictal effects, but does not connect that argument to any specific functional limitations supported by the record that should have been included in the RFC.

Certainly, epilepsy is a condition that could cause significant functional limitations, but it those limitations -- not the medical condition itself -- that must be supported by the record to justify a disability finding.  See Dietrich v. Saul, 501 F. Supp.3d 283, 296 (M.D. Pa. 2020) ("The mere diagnosis of an impairment or presence of a disorder alone will not establish entitlement to benefits; rather, the claimant must show how the alleged impairment or disorder results in disabling limitations.") (citing Walker v. Barnhart, 172 F. App'x 423, 426 (3d Cir. 2006)).  Here, Plaintiff does not point to any functional limitations recommended by his medical providers or reviewing consultants, or otherwise suggest work-related limitations arising from the medical record that the ALJ overlooked. Therefore, Plaintiff has not demonstrated that the ALJ committed error in this regard.

For all of the above-referenced these reasons, I conclude that the ALJ's consideration of Plaintiff's epilepsy is supported by substantial evidence.[22]

### 2.   ALJ's RFC Assessment

Plaintiff next argues that the ALJ improperly rejected the manipulative limitations found by Dr. Choudry, resulting in a flawed RFC assessment.  Doc. 11 at 10-14; Doc. 13 at 5-7.  Defendant counters that the ALJ's RFC assessment is supported by substantial evidence.  Doc. 12 at 7-9.

---

[22]In addition to finding that the ALJ properly considered the frequency, duration, and postictal effects of Plaintiff's seizures, I note that the ALJ included limitations other than flashing or bright lights which account for Plaintiff's seizures, such as never climbing ladders, ropes or scaffolds, or operating motor vehicles, and work that is limited to simple, routine tasks at a consistent pace, but not a production rate pace.

The RFC assessment is the most a claimant can do despite his limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. §§ 404.1545(a)(2), 416.945(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554.  Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984), and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)).  The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE.  Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

"In making a[n RFC] determination, the ALJ must consider all evidence before him."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  Obviously, this includes medical opinion evidence, consideration of which is governed by regulations, in effect since March 27, 2017, that focus on the persuasiveness of each medical opinion.  "We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from your medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).[23]

The regulations list the factors to be utilized in considering medical opinions:

supportability, consistency, treatment relationship including the length and purpose of the

treatment and frequency of examinations, specialization, and other factors including

familiarity with other evidence in the record or an understanding of the disability

program.  Id. §§ 404.1520c(c), 416.920c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

factors, but do not require discussion of the others.  Id. §§ 404.1520c(b)(2),

416.920c(b)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must

consider all the evidence and give some reason for discounting the evidence she rejects."

Plummer, 186 F.3d at 429 (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir.

1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to

credit and which evidence not to credit, so long as she does not "reject evidence for no

reason or for the wrong reason."  Rutherford, 399 F.3d at 554 (quoting Mason v. Shalala,

994 F.2d 1058, 1066 (3d Cir. 1993)); see also Plummer, 186 F.3d at 429 (same).

Here, as previously explained, the ALJ determined that Plaintiff retains the RFC to

perform a limited range of light work.  Tr. at 482-83.  In support of this RFC assessment,

---

[23]The regulations governing applications filed before March 27, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

the ALJ summarized the medical record and Plaintiff's own statements regarding his

functioning, and then evaluated the relevant opinion evidence as follows:

> In November 2018, an independent [consultative examiner, Dr.] Choudry, limited [Plaintiff] to a range of medium to heavy work involving no more than 2 hours of walking and 4 hours of standing in a given workday with occasional postural activities (save for no climbing ropes/ladders/scaffolds), frequent use of the bilateral upper extremities, except for occasional handling bilaterally, and not involving exposure to unprotected heights/operation of a motor vehicle or more than occasional exposure to moving, mechanical parts ([Tr. at 1370-75)].  The undersigned did not find this assessment to be persuasive, as a restriction to medium or heavy work is not supported by the weight of the evidence and by the lumbar x-ray and[] more recently the EMG findings.  In addition, Dr. Chaudry's finding that [Plaintiff] could only occasionally perform postural activities is inconsistent with his simultaneous finding that [Plaintiff] could occasionally lift/carry between 50-100 pounds.  In addition, the manipulative limitations reflected in his assessment are excessive and appear to largely be based on [Plaintiff's] subjective complaints to the detriment of the broader evidentiary findings ([id. at 1604-64, 2532-60]).  For instance, the expanded record references findings of (4+/5) right upper extremity strength and normal left upper extremity strength as well as normal sensation, and does not support the degree of limitation identified in Dr. Choudry's report.

> In contrast, the undersigned found the December 2018 physical capabilities assessment furnished by [Dr. Bart], limiting [Plaintiff] to light work not involving exposure to unprotected heights/hazards or moving machinery ([Tr. at 571-73]) to be broadly persuasive to the degree it mitigates any potential danger associated with [Plaintiff's] seizure disorder and accommodates limitations associated with back pain.  At the same time, given [Plaintiff's] complaints of fatigue and increased pain with exertion, the undersigned sees fit to reduce [Plaintiff] to no more than occasional postural activities.  Further, given his reports of a right upper extremity tremor, the undersigned sees fit to impose

28

> manipulative limitations as noted above.  Lastly, given
> [Plaintiff's] reports of seizure disorder with aura and visual
> sensitivities, the undersigned has imposed additional
> environmental limitations as recounted above.  While
> [Plaintiff] testified to very significant physical limitations, his
> assertions are at odds with the generally benign and localized
> findings, and with the routine and sparse treatment, he has
> sought.  Additionally, in the record [Plaintiff] reported an
> ability to walk two miles on flat ground and a mile on hilly
> ground before needing to rest ([id. at 831]).  He also reports
> he engages in sports, is able to do laundry and routine
> household chores without assistance, and is able to use public
> transportation independently.  These activities generally
> support a finding that he is able to perform light work.

Id. at 488-89.

Plaintiff argues that the ALJ's RFC assessment is flawed because if the ALJ

accepted Dr. Chaudry's opinion that Plaintiff was limited to occasional handling, then he

would be unable to perform the jobs identified by the VE.  Doc. 11 at 12; Doc. 13 at 5-6.

Dr. Chaudry found that Plaintiff's hand and finger dexterity was impaired, that his grip

strength was 4/5 bilaterally, and he observed that Plaintiff had difficulty zipping,

buttoning, and tying.  Tr. at 1369.  As noted above, the ALJ dismissed Dr. Chaudry's

assessment because his manipulative limitations appeared to be based largely on

Plaintiff's subjective complaints and inconsistent with the record as a whole.  Id. at 488.

The ALJ's decision not to credit Dr. Chaudry's manipulative limitations is

supported by substantial evidence.  The ALJ acknowledged Plaintiff's testimony that he

experiences day tremors, mostly in his right hand, that his hands sometimes become

numb, and that he reported difficulty picking up small objects, as well as examination

findings of reduced grip strength from November 2018 (4/5) and January 2020 (4+/5).

Id. at 484-85, 488.  However, the ALJ determined that Dr. Chaudry's overall assessment was not supported by or consistent with the record as a whole.  Thus, whereas Dr. Chaudry found that Plaintiff could lift and/or carry up to twenty pounds frequently and up to 100 pounds occasionally -- that is, that he could perform medium and heavy work -- the ALJ rejected this assessment and limited Plaintiff to light work.  Similarly, the ALJ concluded that evidence of mildly reduced grip strength did not support the degree of manipulative limitations found by Dr. Chaudry, and that a limitation to no more than frequent use of the right upper extremity adequately accounted for Plaintiff's reported tremor and mildly diminished grip strength.  This conclusion is supported by the record. For example, Plaintiff reported in November 2018 that he enjoyed playing baseball, reading, using social media, and going out to eat, all of which involve some degree of gripping and handling.  Id. at 1361-62.  He initially testified that he did not have any difficulty grasping small or large objects, id. at 526, and he stated that he does laundry and can vacuum and clean as long as there are no heavy objects and until his back hurts, and that he does not need any help in the shower or getting dressed.  Id. at 529.

For these reasons, I conclude that the ALJ's RFC assessment as to manipulative limitations is supported by substantial evidence.

### 3.    ALJ's Hypothetical to the VE

In a related argument, Plaintiff argues that the ALJ failed to include all credibly established limitations in hypothetical questions posed to the VE, resulting in flawed hypotheticals to the VE.  Doc. 11 at 14-15.  In the alternative, even assuming the hypothetical questions contained all of the credibly established limitations, Plaintiff

argues that the ALJ failed to resolve an apparent conflict between the RFC and the jobs identified by the VE.  Doc. 11 at 15-16; Doc. 13 at 7-8.  Defendant counters that Plaintiff's argument is without merit. Doc. 12 at 7-12.

As explained in the previous section, the RFC assessment must include a claimant's credibly established limitations.  Rutherford, 399 F.3d at 554.  The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE.  Ramirez, 372 F.3d at 550.  Consistent with my finding in the previous section that the ALJ properly evaluated the opinion of Dr. Chaudry regarding manipulative limitations, I find that the ALJ included all of the credibly established limitations in her hypothetical questions to the VE.

Plaintiff alternatively argues that the ALJ's limitations -- to working in a low-stress job (defined as having only occasional decision-making and only occasional changes in the work setting) and performing simple, routine tasks, at a consistent pace but not a production-rate pace -- conflicts with the reasoning level required for the jobs identified by the VE.  Doc. 11 at 15-16; Doc. 13 at 7-8.  The ALJ adopted the VE's testimony that Plaintiff could perform the positions of survey worker, office helper, and sorter, tr. at 490, 543, all of which carry a reasoning level of 2, defined as "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and][d]eal with problems involving a few concrete variables in or from standardized situations."  See DICOT 205.367-054, 1991 WL 671725 (survey worker); DICOT 239.567-010, 1991 WL 672232 (office helper); DICOT 573.687-034, 1991 WL 683994 (sorter).  The Third Circuit has held that there is no conflict between simple,

repetitive tasks and a reasoning level of 2.  Money v. Barnhart, 91 F. App'x 210, 215 (3d

Cir. 2004) ("Working at reasoning level 2 [does] not contradict the mandate that [a

claimant's] work be simple, routine, and repetitive.").  Indeed, the Third Circuit has held

that there is no per se conflict between reasoning level 3 and a limitation to "simple and

repetitive tasks, involving routine work."  Zirnsak, 777 F.3d at 618 (3d Cir. 2014).

Therefore, the reasoning level of the jobs identified by the VE is consistent with the

limitations contained in the ALJ's hypothetical questions.  This is sufficient to satisfy the

Commissioner's burden at step five of the sequential evaluation.  See Sanchez v.

Comm'r, 705 F. App'x 95, 99 (3d Cir. 2017) (affirming where the ALJ cited one job that

the claimant could perform, despite any error with the other two cited jobs).

Plaintiff further argues that the ALJ's limitation to low stress work, in addition to

simple/routine, distinguishes his case from Money.  Doc. 13 at 7-8.  In support of his

argument, Plaintiff relies on Mullis v. Colvin, Civ. Action No. 11-22, 2014 WL 2257188

(M.D.N.C. May 29, 2014) and Ferguson v. Berryhill, 381 F. Supp.3d 702 (W.D. Va.

2019).  Doc. 13 at 8.  These cases are not binding on this court.  Moreover, the Third

Circuit has held that the term "simple routine tasks" generally refers to the non-exertional

or mental aspects of work and typically involves low stress level work that does not

require maintaining sustained concentration, Menkes v. Astrue, 262 F. App'x 410, 412

(3d Cir. 2008), and courts in this jurisdiction have found that an ALJ's hypothetical

question limiting a plaintiff to simple, repetitive tasks sufficiently covers the need to

work in a low stress environment.  See, e.g., Miller v. Colvin, Civ. Action No. 13-1383,

2014 WL 4218622, at *6 (W.D. Pa. Aug. 25, 2014) (ALJ hypothetical adequately

conveyed need to work in low stress environment through inclusion of words "simple, repetitive tasks"); Zelenka v. Colvin, Civ. Action No. 11-1442, 2013 WL 941823, at *5 (W.D. Pa. Mar. 11, 2013) (same); Willingham v. Astrue, Civ. Action No. 09-2368, 2010 WL 629839, at *2 (E.D. Pa. Feb. 17, 2010) (low stress work defined as involving only occasional decision making and only occasional changes in the work setting); cf. Noll v. Saul, Civ. Action No. 18-2145, 2020 WL 5249141, at *7-8 (M.D. Pa. Aug. 3, 2020) (recommending remand where ALJ accounted for requirement of low stress work by limiting plaintiff to simple work with occasional decision-making and occasional changes in work setting, but did not include limitation to goal-oriented rather than production rate pace), adopted in relevant part, 2020 WL 5232405 (M.D. Pa. Sep. 2, 2020).

Here, as previously noted, both the ALJ's hypothetical to the VE and her RFC determination limited Plaintiff to low-stress work and to simple, routine tasks, explicitly defining the former as having only occasional decision-making and only occasional changes in the work setting, and the latter as involving a consistent pace "but not a production-rate pace where each task must be completed within a strict time deadline." Tr. at 483.  Because this adequately conveyed Plaintiff's limitation to low stress work, I find that the ALJ's opinion in this regard is supported by substantial evidence.

## V.   **CONCLUSION**

The ALJ properly evaluated Plaintiff's epilepsy, properly assessed Plaintiff's RFC, and properly relied on the VE's testimony.  Therefore, I find that the ALJ's decision is supported by substantial evidence.

An appropriate Order follows.